(No. 67466.—■■■■■■)

THOMAS J. BROECKL *et al.*, Appellants, v. THE CHICAGO PARK DISTRICT, Appellee.

*Opinion filed September 20, 1989.*

80

Craig E. Anderson, Charles J. Corrigan, Allen D. Choka, and Herbert I. Rothbart, all of Chicago, for appellants.

George F. Galland, Jr., of Davis, Barnhill & Galland, of Chicago, for appellee.

Peter M. Murphy, of Springfield, for *amicus curiae* Illinois Association of Park Districts.

Thomas W. Kelty, of Pfeifer & Kelty, P.C., of Springfield, for *amicus curiae* Illinois Municipal League.

JUSTICE RYAN delivered the opinion of the court:

This appeal involves the validity of mooring fees imposed by the Chicago Park District. Two issues are presented. The first is whether the park district's practice of charging mooring fees in excess of the expenses and costs actually incurred is permissible. The second issue is whether the statute that permits the park district to charge nonresidents of Chicago a higher fee than residents is unconstitutional and void.

The defendant, the Chicago Park District, charges mooring fees that exceed operation and maintenance costs of recreational boating harbors. The defendant also charges nonresidents of Chicago a 25% higher fee than it charges residents. As a result of these practices, it is alleged that the defendant makes a 100% to 500% profit. The plaintiffs filed a class action in the circuit court of Cook County, contending that this profit-generating activity is illegal. The plaintiffs additionally contended that both the statute authorizing the park district to charge nonresidents higher mooring fees (Ill. Rev. Stat. 1987, ch. 105, par. 333.23n(g)) and the park district's practice of charging nonresidents higher fees are unconstitu-

tional. The trial court held that the park district could make a profit by charging mooring fees that exceed operating and maintenance costs. The trial court also held the park district's practice of charging nonresidents higher fees, and the statute authorizing this practice, unconstitutional and void.

Both parties appealed. The appellate court affirmed the trial court's holding that the park district could generate a profit by charging fees that exceed costs. The appellate court, however, found that the practice of imposing higher fees upon nonresidents was constitutional, and thus reversed the trial court's decision on this issue. 170 Ill. App. 3d 1063.

We acknowledge that the concept of "profit" in the context of the park district's operation is vague and elusive. Nevertheless, we must examine the issue raised by plaintiffs of whether the park district may generate a "profit" by charging fees that exceed costs. The appellate court rejected the plaintiffs' argument that the park district is required by law to limit fees to an amount approximating the cost of furnishing and maintaining the moorings. The court reached this conclusion after examining several portions of the statutory scheme (Ill. Rev. Stat. 1987, ch. 105, par. 333.1 *et seq.*) that authorize and regulate park district functions, and finding specific language indicating that the park district could make a "profit" through the rental of harbor spaces. (170 Ill. App. 3d at 1065-66.) The appellate court also relied upon this court's opinion in *MacNeil v. Chicago Park District* (1948), 401 Ill. 556. We have reviewed the applicable statutory authority and the *MacNeil* decision, and agree with the appellate court's decision that the park district may derive a profit from the mooring fees.

We begin by examining the statutory authority that creates and confers powers upon the park district. (See Ill. Rev. Stat. 1987, ch. 105, par. 333.1 *et seq.*) After re-

viewing the applicable grant of statutory authority, we agree with the appellate court's conclusion that the legislature intended that the park district operate the harbors at a profit; that is, it did not intend to limit the park district to charging fees that only cover the cost of operation. (See Ill. Rev. Stat. 1987, ch. 105, par. 333.1 *et seq.*) We first find evidence of this intent in sections 26.1 through 26.10 of the statute, which authorize the park district to charge rental fees for mooring boats in the city's harbors. (Ill. Rev. Stat. 1987, ch. 105, pars. 333.23*l* through 333.23u.) The specific authorization to charge fees is found in section 26.3(g) of the park district statute (Ill. Rev. Stat. 1987, ch. 105, par. 333.23n(g)), which provides that the park district may "establish and collect fees for all facilities and services, and compensation for all materials furnished. Fees charged nonresidents of such district need not be the same as fees charged to residents of the district." We note that this language does not create a limitation on the amount of fees, and it thus indicates a legislative intention that the determination of the amount to be charged is within the discretion of the park district.

We note that the statute authorizes the park district to charge nonresidents more than residents. Because the operating cost of providing moorings to nonresidents is the same as the cost of providing moorings to residents, we agree with the appellate court that "this statutory provision reflects a legislative intention not to tie the fees charged for moorings to defendant's costs and expenses for furnishing and maintaining the moorings." (170 Ill. App. 3d at 1066.) If the legislature had intended that the fees charged for moorings were to be limited to actual costs, the legislature would not have explicitly stated that nonresidents could be charged higher fees.

Further support for the park district's argument that the legislature intended that it generate profits from the

harbors is found in section 26.7, which authorizes the park district to issue revenue bonds to acquire, construct, enlarge, improve, operate, and maintain its harbors. (Ill. Rev. Stat. 1987, ch. 105, par. 333.23r.) Subsection (*l*) of this section provides that the park district ordinance that governs such bond issues may include "covenants as may be deemed necessary or desirable to assure a *successful and profitable operation* of the harbor and facilities, and prompt payment of the principal of and interest upon the bonds." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 105, par. 333.23r(*l*).) This language reveals a legislative intention that the park district be authorized to conduct a profitable operation of its harbors. In short, we reject the plaintiffs' argument that the mooring fees must mirror actual costs. We agree with the appellate court's deductive reasoning that "[s]ince mooring fees are the Chicago Park District's main source of revenue from the harbors, if a profitable operation of the harbors is to be accomplished, it can only be accomplished through profits derived from mooring fees." 170 Ill. App. 3d at 1066.

Section 26.8 of the statute further supports this conclusion. (Ill. Rev. Stat. 1987, ch. 105, par. 333.23s.) This section provides that the park district may receive revenues from the operation of its harbors in excess of the requirements for retirement of revenue bonds or for payment of maintenance, operation, depreciation, rehabilitation and expansion of the harbors. After all such bonds have been paid, the revenues may be transferred to the general corporate fund of the park district and used for the maintenance, operation, repair and development of the harbors or "for any corporate purpose." (Ill. Rev. Stat. 1987, ch. 105, par. 333.23s.) The legislature would not have included this provision if it had not intended that the park district make a profit through operation of the harbors. The fact that the statutory lan-

guage explicitly provides that any amount of money earned could be used for either harbor purposes or any corporate purpose indicates that the legislature did not intend that the park district restrict fees to actual costs.

The plaintiffs argue, however, that the statutory scheme detailed above does not apply in the instant case because it only applies to bonded facilities. The statute provides that revenues from the facilities (bonded moorings) may be used for any corporate purpose once the bonds have been paid off. We believe that this authorization demonstrates that mooring fees from nonbonded moorings may also be used for general corporate purposes because once the bonds are paid, bonded facilities become nonbonded facilities. Because there is no apparent reason why the legislature would allow only bonded mooring revenues to be used for general corporate purposes once the bonds are paid, we find that the plaintiffs' argument on this issue is without merit.

The plaintiffs make several additional arguments that hinge upon their premise that the legislature intended to create special rules for bonded moorings with respect to their profit-generating capacity. Because we have concluded that the legislature intended that the park district operate all of its mooring facilities in a profitable fashion, we find it unnecessary to address these arguments.

In reaching its decision, the appellate court relied upon this court's decision in *MacNeil v. Chicago Park District* (1948), 401 Ill. 556, which predated the enactment of that section of the park district statute which authorizes charging fees. In *MacNeil*, the plaintiff was a boat owner who contended that the park district did not possess the requisite authority to charge mooring fees. The plaintiff further alleged that the fees were unreasonable and arbitrarily excessive, bearing no reasonable relation to the cost of regulation or to any special service rendered to boat owners. (*MacNeil*, 401 Ill. at 559.) This

court rejected the plaintiff's arguments and found that the park district possessed the authority to charge mooring fees and that the amount of the fees was reasonable. Although at the time the *MacNeil* case was decided no specific statutory authorization for such fees existed, this court stated:

> "We know of no case which holds that a particular act complained of, such as the assessment of harbor fees in this case, must be supported specifically in exact words in a statute. We, therefore, hold that, in the circumstances of the case at bar, the power to establish and maintain rules and regulations for the use of lagoons and harbors by the public carries with it the power to require a reasonable fee for the use of such special facilities." *MacNeil*, 401 Ill. at 564.

The plaintiffs in the present case, like the plaintiffs in *MacNeil*, argue that the mooring fees are, in effect, licensing fees that must be limited to a level approximating the cost of regulating the questioned activity. This court rejected that argument in *MacNeil* and we reject it again in the case before us. As this court held in *Mac-Neil*, such an argument is valid only if the fees were imposed under the park district's police power. (See *Mac-Neil*, 401 Ill. at 564.) Charging mooring fees, however, is not a police power measure. The reasoning employed in *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.* (1917), 279 Ill. 324, which was cited in the *MacNeil* case, applies in the present case as well:

> "The ordinance was not a police ordinance. It was not passed for the enforcement of local governmental supervision, but only to establish a charge in the nature of rental for the exclusive use of parts of the streets. The fixing of a charge in the nature of rental for the occupation by a public service corporation of parts of the streets of a city is not the exercise of any governmental power but is the exercise of the proprietary power of the city." *Springfield*, 279 Ill. at 327.

Thus, we conclude that the park district was not exercising a police power function when it imposed the mooring fee. Rather, the fee is in the nature of a rental and is permissible under the *MacNeil* holding. Because we find that the mooring fee is a rental charge, we will not address the plaintiffs' argument that the fee constitutes the unconstitutional practice of "licensing for revenue."

We now turn our attention to the second issue in this case: whether the statute that permits the park district to charge nonresidents of Chicago a higher fee than residents is unconstitutional and void. We find that the statute (Ill. Rev. Stat. 1987, ch. 105, par. 333.23n(g)) satisfies constitutional safeguards and, therefore, affirm the holding of the appellate court.

The appellate court's opinion in this case (170 Ill. App. 3d at 1068) and the briefs filed in this court discuss the privileges and immunities clause of the Federal Constitution (U.S. Const., art. IV, §2) and also *Baldwin v. Fish & Game Comm'n* (1977), 436 U.S. 371, 56 L. Ed. 2d 354, 98 S. Ct. 1852. We find, however, that any discussion of the privileges and immunities clause of the Federal Constitution is inappropriate. That clause provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." (U.S. Const., art. IV, §2.) The Supreme Court, in *Baldwin*, has summarized the application of the clause as follows:

"When the Privileges and Immunities Clause has been applied to specific cases, it has been interpreted to prevent a State from imposing unreasonable burdens on *citizens of other States* in their pursuit of common callings within the State [citation]; in the ownership and disposition of privately held property within the State [citation]; and in access to the courts of the State [citation]." (Emphasis added.) *Baldwin*, 436 U.S. at 383, 56 L. Ed. 2d at 364-65, 98 S. Ct. at 1860.

In short, the clause prohibits one State from discriminating against citizens of another State. The privileges and immunities clause does not apply where a city or municipal ordinance discriminates against intrastate residents. (*United Building & Construction Trades Council v. Mayor & Council* (1984), 465 U.S. 208, 217, 79 L. Ed. 2d 249, 257, 104 S. Ct. 1020, 1027.) We find that the privileges and immunities clause does not apply in the present case because the plaintiffs are in-state plaintiffs complaining about a statute that favors residents of Chicago. Thus, the plaintiffs do not possess the requisite standing to challenge the statute on this ground.

We also reject the plaintiffs' argument that the 25% surcharge on nonresidents of the park district violates equal protection guarantees, and conclude that the surcharge survives scrutiny under both the Federal equal protection clause (U.S. Const., amend. XIV) and the Illinois equal protection clause (Ill. Const. 1970, art. I, §2). In the absence of a fundamental right or suspect classification, similar classes of people may be treated differently, if a rational basis exists. See *Jenkins v. Wu* (1984), 102 Ill. 2d 468, 477.

In *Baldwin*, the Court considered hunting license fees for the State of Montana. The fee for a nonresident's license to hunt elk was substantially more than that of a resident of Montana. The Supreme Court held that this treatment of nonresidents did not violate the privileges and immunities clause of the Federal Constitution, because equality in access to Montana elk is not basic to the maintenance or well-being of the Union. *Baldwin*, 436 U.S. at 388, 56 L. Ed. 2d at 368, 98 S. Ct. at 1863.

The Supreme Court then considered the equal protection aspect of the distinction drawn between residents and nonresidents. (*Baldwin*, 436 U.S. at 388-92, 56 L. Ed. 2d at 368-70, 98 S. Ct. at 1863-64.) The Court noted

that a resident of the State of Montana assists in the maintenance of big-game population through taxes. The same taxes support the State parks utilized by sportsmen, provide roads for access to the hunting areas, provide fire suppression to protect wildlife habitats, provide a means for enforcing game laws, and provide other services incident to maintaining necessary aids to a satisfactory hunting environment. The Court noted that on the other side of the same ledger is the almost alarming increase in the number of nonresident hunters and the additional problems presented by their presence. The Court found that the legislature's choice of a differential in hunting license fees was an economic means not unreasonably related to the preservation of a finite resource, wild elk.

The same rationale compels us to hold that the difference in mooring fees charged to residents of the park district and to nonresidents is not a violation of the equal protection clause of the Federal or this State's Constitution. The park district is authorized to levy taxes (Ill. Rev. Stat. 1987, ch. 105, par. 333.19) and to issue bonds (Ill. Rev. Stat. 1987, ch. 105, par. 333.20). Through these taxes and bonds the residents of the park district support services and facilities that are not supported by nonresidents. In fact, if the mooring fees charged to both residents and nonresidents were the same, the residents of the park district would be paying a disproportionate share of the costs of maintaining the park district's services and facilities.

As noted by the Supreme Court in *Baldwin*, the other side of the ledger reflects an ever-increasing demand for a limited resource, in our case, harbor facilities. The differential in mooring fees reflects a reasonable approach to equitably distribute the costs of providing these facilities, and is founded on a rational basis.

The plaintiffs also challenge the fee differential on the basis of the public trust doctrine, contending that the

park district is attempting, through the use of the surcharge on nonresidents, to reallocate the mooring facilities from the general public to the residents of the park district. In *MacNeil*, the plaintiffs also contended that the park district held the harbors in trust for the benefit of the public and that the fees charged must be based on the reasonable costs of the special services provided. This court rejected that contention in *MacNeil*, and held that the park district was, in effect, renting the mooring facilities and could charge reasonable fees for the use of those facilities, and that the amount of the fees charged was discretionary in the park commissioners. (*MacNeil*, 401 Ill. at 565-66.) True, *MacNeil* did not involve a surcharge for nonresidents. However, if the amount of the fee is discretionary in the park commissioners, as the court held in *MacNeil*, then, absent an equal protection violation, the fees charged to nonresidents may be more than those charged to residents. The park district correctly notes, in its briefs, that the public trust doctrine is not a super equal protection clause to be used to strike down reasonable legislative classifications.

In summary, we affirm the appellate court's decision that the park district's practice of charging mooring fees in excess of the expenses and costs actually incurred is permissible. We also affirm the conclusion of the appellate court that the statute that permits the park district to impose a 25% surcharge upon nonresidents is constitutional. The judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE MILLER took no part in the consideration or decision of this case.